UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| CORRIE B. DIAZ,<br>a.k.a. Corrie B. Pickett,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Commissioner of Social Security,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No. 4:13-cv-04034-SLD<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

Plaintiff Corrie B. Diaz, also known as Corrie B. Pickett,[1] appeals the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("the Commissioner"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§ 401–433, 1381–1383f. This matter comes before the Court on the Plaintiff's motion Requesting Reversal and Remand, ECF No. 12, and Defendant's Motion for Summary Affirmance, ECF No. 17. For the following reasons, the Court GRANTS Plaintiff's motion for reversal and remand and DENIES Defendant's Motion for Summary Affirmance.

## BACKGROUND

Diaz filed applications for SSI on August 27, 2009, and DIB on October 22, 2009, alleging that she became disabled as of April 1, 2008. R. 141. Both applications were denied on February 22, 2010. *Id.* Diaz requested reconsideration; her claims were denied a second time on

---

[1] To maintain consistency with the record and docket, Plaintiff will be referred to as "Diaz" throughout this Order.

1

June 14, 2010. *Id.* She requested a hearing, which was held via video conference on August 18, 2011, before Administrative Law Judge ("ALJ") Robert C. Asbille. *Id.* On August 26, 2011, Asbille issued a decision finding that Diaz had six severe impairments—"bad back, sore foot, bipolar disorder, anxiety, personality disorder, and substance abuse"—but could still work under certain limitations and therefore was ineligible for benefits. *See* R. 155. Diaz appealed to the Appeals Council, which issued an order on May 29, 2012, vacating and remanding ALJ Asbille's decision. R. 163–64. Specifically, the Appeals Council remanded the case (1) for clarification of the ALJ's residual functional capacity ("RFC") assessment as to the frequency and length of time Diaz would have to alternate between sitting and standing, and (2) for the vocational expert to reconcile his testimony that Diaz could perform the jobs of assembler and general office clerk with the Dictionary of Occupational Titles, which does not specifically address the sit/stand option. R. 163.

On remand, Diaz's case came before ALJ Shreese M. Wilson. A hearing was held via video conference on September 18, 2012, at which Diaz testified as well as Alfred Walker, a vocational expert. R. 14. ALJ Wilson found that Diaz had five severe impairments: degenerative disc disease, osteoarthritis of the foot, bipolar disorder, anxiety, and a personality disorder. R. 16. The ALJ found that these impairments or combination thereof did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. §§ 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926) ("Listing of Impairments"). R. 17. ALJ Wilson also found that Diaz retained the RFC to perform "sedentary work" as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a), with the following additional limitations:

> [Diaz] must alternate sitting and standing once an hour for 5 minutes, she can never climb ladders, ropes or scaffolds, she can work with minimal contact with

2

the general public and no more than occasional contact with co-workers or supervisors, and she is limited to tasks learned within 30 days that are routine and repetitive in nature, in a low-stress environment (no more than occasional decision-making or changes in the work setting).

R. 18. Based on Walker's testimony, ALJ Wilson found that there were a significant number of jobs in the national economy that Diaz could perform, such as ticket checker, addresser, and document preparer. R. 21–22. As a result of this analysis, the ALJ found that Diaz was not disabled from April 1, 2008, through the date of her decision, October 11, 2012. R. 22. The Appeals Council granted review of ALJ Wilson's decision on the grounds that she failed to sufficiently examine the impact of Diaz's obesity. R. 313–15. In the final administrative decision in this case, on March 12, 2013, the Appeals Council examined Diaz's obesity and nevertheless concluded that she was not disabled, adopting most of ALJ's Wilson's findings, including those on Diaz's mental impairments. R. 4–7. Diaz filed the instant action on April 11, 2013, requesting the Court's review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## LEGAL FRAMEWORK

### I. District Court Review of the ALJ Decision

A court's function on review is not to try the case de novo or to supplant the ALJ's findings with the court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989). Instead, the court's role is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *See Cannon v. Apfel*, 213 F.3d 970, 975 (7th Cir. 2000). To determine whether substantial evidence exists, the court reviews the record as a whole but does not reconsider facts, reweigh evidence, resolve conflicts in evidence, or decide questions of credibility. *See id.* (citing *Williams v. Apfel*, 179 F.3d 1066, 1072 (7th Cir. 1999)).

Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). Even if reasonable minds could differ concerning a disability determination, the ALJ's decision must be affirmed if it is adequately supported. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000).

Although great deference is afforded to the determination made by the ALJ, a court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citations omitted). Rather, the ALJ's decision must "sufficiently articulate their assessment of the evidence to assure us that they considered the important evidence and to enable us to trace the path of their reasoning." *Id*. at 595 (quoting *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999)). The ALJ has a duty to "minimally articulate his or her justification for rejecting or accepting specific evidence of disability." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citing *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)).

Further, the ALJ's decision must build an accurate and logical bridge between the evidence and the ultimate conclusions. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010); *Scott*, 297 F.3d at 595. "Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Kararsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002)). If there is an error of law, "reversal is, of course, warranted irrespective of the volume of evidence supporting the factual findings." *Schmoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

## II. Entitlement to Benefits

In order to be entitled to DIB and/or SSI, a claimant must show that his inability to work is medical in nature and that he is totally disabled.[2] Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a claimant is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966. The establishment of disability under the Social Security Act is a two-step process.

First, the claimant must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a factual determination that the impairment renders the claimant unable to engage in any substantial gainful employment. *See McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). This factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test requires to the ALJ to evaluate whether the claimant:

1) Has not, during the relevant time period, performed any substantial gainful activity;

2) Suffers from an impairment that is severe or whether a combination of his impairments is severe;

3) Suffers from an impairment which matches or is substantially equivalent to an impairment in the Listing of Impairments;

4) Is unable to perform his former occupation; and

5) Is unable to perform any other work within the national economy.

An affirmative answer at steps 1, 2, or 4 leads to the next step of the test. An affirmative answer at steps 3 or 5 leads to a finding that the claimant is disabled. Conversely, a negative

---

[2] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. §§ 404.1500–404.1599 (DIB) *with* 20 C.F.R. §§ 416.900–416.998 (SSI).

answer at any point, other than at step 3, stops the inquiry and leads to a determination that the claimant is not disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at step 3 requires the ALJ to proceed to step 4, where the ALJ will make a finding about the claimant's RFC based on all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC "measures the claimant's capacity to engage in basic work activities. If the claimant's RFC permits him to perform his prior work, benefits are denied." *Bowen v. New York*, 476 U.S. 467, 471 (1986) (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)). If, on the other hand, the claimant cannot perform his past relevant work, then the RFC is used in step 5 to determine whether the plaintiff can adjust to other work. 20 C.F.R. § 404.1520(e).

The claimant has the burden of production and persuasion at steps 1 through 4. But once the claimant shows an inability to perform past work (step 4), the burden shifts to the Commissioner to show that the claimant is able to engage in some other type of substantial gainful employment (step 5). *Tom v. Heckler*, 779 F.2d 1250, 1252–53 (7th Cir. 1985).

## DISCUSSION

On appeal, Diaz disputes only the ALJ's findings regarding her mental impairments. *See* Pl.'s Mot. Summ. J. 3–4, ECF No. 12. Specifically, Diaz argues that the ALJ failed to provide a minimum articulation, adequately supported by evidence, of her reasons for discounting multiple low Global Assessment of Functioning ("GAF") scores physicians assigned Diaz. *Id.*

### I. Standard Governing Deference to Physicians' GAF Scores

In order to determine a claimant's RFC, an ALJ must determine what weight to give the opinions of his treating physicians. 20 C.F.R. § 404.1527. The general rule is that a treating physician's opinion is entitled to controlling weight if it is supported by medical evidence that is not inconsistent with other evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th

Cir. 2003). This "treating physician rule" is a two-step inquiry that the ALJ must conduct when determining the claimant's RFC if a treating physician's opinion is part of the record. First, the ALJ must determine if the physician's findings are supported by the medical findings and consistent with other substantial evidence on the record. If so, the physician's opinion is given controlling weight. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

On the other hand, if an ALJ determines that a treating physician's opinion does not deserve controlling weight, then the ALJ must consider factors outlined in the regulations to determine what weight it deserves. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). Those factors are: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the supportability of the opinion; (4) the consistency of the opinion with the record; (5) the specialization of the treating source; and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c). If an ALJ rejects a treating physician's medical opinion because it is inconsistent with other evidence in the record, he must articulate his reasons for doing so. *Barthelemy v. Barnhart*, 107 F. App'x 689, 693 (7th Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2).

A GAF score does not singly dictate an ALJ's finding of disability. *See Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). GAF scores are "useful for planning treatment," but do not necessarily reflect a patient's functional level. *Denton*, 596 F.3d at 425. Rather than rely solely on the bare numerical score, an ALJ may consider the clinician's explanation of impairments that accompanies the score. *Id.* Moreover, a GAF score represents a "snapshot" of the claimant at a particular moment, and does not necessarily reflect their condition in the long term. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). While an ALJ has no duty to give any weight to an individual GAF score, she

cannot ignore or reject without evidentiary basis a whole series of GAF scores favorable to the claimant. *See Yurt v. Colvin*, 758 F.3d 850, 859–60 (7th Cir. 2014); *Walters*, 444 F. App'x at 919. An ALJ may not cherry pick evidence that supports her opinion without regard for its context, nor "ignore a line of evidence that suggests disability." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

## II. Evidence and ALJ Findings Regarding Diaz's GAF Score

ALJ Wilson incorporated ALJ Asbille's findings regarding Diaz's mental impairments, including his assessment of GAF scores leading up to his August 2011 decision. R. 20. ALJ Asbille did not accord weight to GAF scores of 45 Diaz received in October 2009 when she was hospitalized due to a cocaine overdose, R. 601–02, and again in January 2010 when she was hospitalized due to "suicidal ideation in the setting of cocaine dependence," where her GAF had risen to 60 upon discharge, R. 589–91. A GAF score between 41 and 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).'" *Williams v. Colvin*, No. 13-3607, 2014 WL 2964078, at *3 (7th Cir. July 2, 2014) (quoting Am. Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM")). A score from 51 to 60 indicates "moderate symptoms or 'moderate difficulty in social, occupational, or school functioning.'" *Sims v. Barnhart*, 309 F.3d 424, 427 n.5 (7th Cir. 2002) (quoting DSM at 32). Although ALJ Asbille does not state a reason, the Commissioner argues that ALJ Asbille rejected Diaz's GAF scores of 45 because he found them to be drug induced. Def.'s Mot. Summ. Affirm. 9, ECF No. 18 (citing 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would .

8

. . be a contributing factor material to the Commissioner's determination that the individual is disabled."))

ALJ Asbille noted another GAF score of 45 Diaz received while being treated at the Kenosha Community Health Center in September 2010. R. 722–23. The ALJ expressly rejected this assessment because Diaz was not prescribed psychiatric medication during that treatment and "[t]he treatment notes mainly show the claimant's subjective complaints." R. 153. By contrast, ALJ Asbille found significant the GAF score of 60 assigned to Diaz upon her January 2010 hospital discharge and also by Dr. John Ciaccio, the treating psychiatrist at Trinity Medical Center/Robert Young Center, on June 22, 2011, R. 753. *See* R. 151. Indeed, ALJ Asbille accorded "significant weight" to the opinion of Dr. Mark Oberlander—a medical expert who testified at Diaz's hearing—despite noting that Dr. Oberlander, not one of Diaz's treating physicians, "did not have all the medical evidence available to [him]." Dr. Oberlander had apparently determined that the GAF score of 60 was appropriate, and expressly based his answers regarding Diaz's functional limitations on that score, not 45. *See* R. 96–97.

In addition to ALJ Asbille's findings, ALJ Wilson considered evidence of other mental assessments Diaz submitted after remand. On March 8, 2011, another medical professional at Trinity Medical Center had assigned Diaz a GAF score of 45. R. 757–58. On September 2, 2011, Dr. Ciaccio, who had continued to treat Diaz, assessed her GAF at 45 in a "six month review," and did so again on March 2, 2012, upon her "annual review." R. 755–6, 839–40. On March 14, 2012, the Trinity Medical Center closed Diaz's treatment schedule on the grounds that she had failed to show for three appointments, noting that her opening and closing GAF scores were both 45. R. 837–38. Diaz later returned to treatment at Trinity, and a July 10, 2012 initial

diagnostic assessment and accompanying treatment plan stated her current GAF at 41. R. 843–853.

In her analysis, ALJ Wilson, like ALJ Asbille, notes the GAF score of 60 assigned by Dr. Ciaccio in June 2011, as well as the March 2012 GAF of 45. R. 20. She rejects the latter on the grounds that it "over-valued unsupported subjective allegations." *Id.* Although ALJ Wilson addresses and rejects other opinions by Dr. Ciaccio that oppose her conclusion—largely on the grounds that Dr. Ciaccio's opinions are inconsistent with his progress notes regarding Diaz's mental status during their consultations—she does not mention any of Diaz's other GAF scores. *See id.*

**III. Analysis**

ALJs Asbille and Wilson engaged in just the sort of "cherry-picking" of favorable evidence that the Seventh Circuit forbids. *See Yurt*, 758 F.3d at 859. In *Yurt*, for example, the ALJ highlighted Yurt's one-time GAF score of 60, ignoring multiple subsequent lower GAF scores by a different physician, in finding that Yurt's mental impairments did not preclude work. *Id.* Noting that the ALJ was not obligated to take any particular GAF score into account, the court nevertheless rejected the ALJ's narrow focus on Yurt's "high water mark GAF" because the lower GAF scores from multiple sources were evidence favorable to Yurt's claim that the ALJ failed to account for. *See id.*; *see also Indoranto*, 374 F.3d at 474 (noting that ALJ must explain why he rejected evidence that does not support his decision).

Similarly, here both ALJs fastened on the "high water mark GAF" of 60 that supported their conclusion that Diaz was only moderately limited by her mental impairments, even though Diaz far more often received GAF scores in the 40s, indicating "serious impairment" in functioning. *See Williams*, 2014 WL 2964078, at *3. In particular, ALJ Wilson almost entirely

10

ignores the several lower GAF scores, showing a general downward trend, that Diaz receives after the June 2011 GAF upon which Wilson relies. These include GAF scores from the same psychiatrist who originally assessed Diaz at 60, as well as other sources.

The one GAF score of 45 that ALJ Wilson addresses—from Dr. Ciaccio on March 2, 2012—she rejects as "apparently based on subjective allegations." R. 20. An ALJ need not give controlling weight to treating physician opinions that are not supported by medical findings and consistent with other evidence in the record. *See Schmidt*, 496 F.3d at 842. ALJs must rely on medical opinions based on objective observations, not those opinions that "amount merely to a recitation of a claimant's subjective complaints." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). ALJ Wilson does not indicate what "subjective allegations" she is referring to, and the Court finds few if any on the bare "Individual Treatment Plan" form bearing that GAF score. *See* R. 839–40.

The Commissioner argues that the context supports the ALJ's rejection of this GAF score. *See* Def.'s Mem. in Supp. Mot. Summ. Affirm. 7. ALJ Wilson noted that Dr. Ciaccio repeatedly wrote that Diaz's mental status exams were "normal." This observation and Dr. Ciaccio's progress notes from December 16, 2011, stating that Diaz "feels much better" and "feels her mood is stable," purportedly undermined the GAF score of 45 he assigned in March 2012, in addition to its alleged reliance on subjective allegations. R. 20. However, as noted, the March 2012 GAF was an "annual review" and presumably incorporated a much broader swath of evidence concerning Diaz's mental health than her feelings on one day. *See* R. 839. Further, while noting her subjective optimism and appropriate self-presentation, Dr. Ciaccio also stated that Diaz had social phobia, panic disorder with agoraphobia, post-traumatic stress disorder, and borderline personality disorder that were not in remission. *See* R. 841. Nothing indicates that

11

these technical medical descriptions echoed any of Diaz's subjective lay statements, or that they were not based in or were inconsistent with the history of medical evidence establishing Diaz's mental disorders. Moreover, ALJ Wilson's unreasonable rejection of Dr. Ciaccio's March 2012 GAF is her only effort to confront a string of low GAF scores assigned by treating physicians that support Diaz's claim. *See Bates*, 736 F.3d at 1099. An ALJ may not discredit the unaddressed physician opinions *sub silentio* and ignore substantial contrary evidence in this fashion. *See* 20 C.F.R. § 404.1527(c)(2) (providing that ALJs "will always give good reasons" in their decisions "for the weight we give [a] treating source's opinion").

Similarly, ALJ Asbille rejected the GAF score of 45 assessed by a mental health clinician at Kenosha Community Health Center in September 2010 because Diaz was not prescribed psychotropic medication at the time and the clinician's notes "mainly show the claimant's subjective complaints." R. 149. While the Kenosha clinician notes detail Diaz's complaints, her records do state some objective observations. See R. 722. These include: that Diaz had four cut marks on her left forearm, that another doctor reported that Diaz had called in the previous few days and "is very disturbed"; and that Diaz had a panic attack in the waiting room, outwardly manifested by hand-wringing, hyperventilating, and "looking overwhelmed." R. 717, 722. However, even if ALJ Asbille was justified in rejecting this as well as Diaz's other early GAF scores of 45—on the grounds that they were drug induced—no ALJ expresses these criticisms regarding multiple unaddressed later GAF scores in the 40s.

GAF scores have limited ability to shed light on a claimant's functionality because each represents only a momentary snap-shot of the claimant's condition. *See Punzio*, 630 F.3d at 710. However, several GAF scores in the 40s assigned by multiple treating sources over eighteen months suggest a long-term condition. By discounting two of these low GAF scores

based on highly selective readings of the evidence and omitting mention of the rest, the ALJs ignored or rejected without adequate explanation a whole line of evidence showing that Diaz's mental functionality was far more limited than they concluded. *See Yurt*, 758 F.3d at 860; *Bates*, 736 F.3d at 1099.

The Commissioner argues that the ALJs had sufficient grounds to find incredible Diaz's testimony regarding the limitations imposed by her mental impairments, and therefore reasonably discounted GAF scores based on Diaz's subjective claims. Def.'s Mem. in Supp. Mot. Summ. Affirm. 11. However, no ALJ found that subjective complaints dictated all of Diaz's low GAF scores. And, if this was their reasoning, the ALJs had a duty to at least "minimally articulate" it, *see Scheck*, 357 F.3d at 700, and confront such significant evidence supporting Diaz's claim, *see Indoranto*, 374 F.3d at 474. Instead, the ALJs impermissibly ignored multiple GAF scores that tended to undermine their findings.

Accordingly, the final decision of the Commissioner is reversed. This case is remanded to the Social Security Administration for proper consideration of Diaz's GAF scores and their implications for her ability to work.

## CONCLUSION

Plaintiff's motion Requesting Reversal and Remand, ECF No. 12, is GRANTED, and Defendant's Motion for Summary Affirmance, ECF No. 17, is DENIED. The decision of the Commissioner is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this order.

Entered this 29th day of September, 2014.

s/ Sara Darrow<br>
SARA DARROW<br>
UNITED STATES DISTRICT JUDGE